# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM L. CMEHIL<br>5060 Mad River Road<br>Hillsboro, OH  45133 | : <br> : <br> : <br> : | Case No. <u>1:19-cv-602</u> |
| Plaintiff, | : <br> : | **COMPLAINT WITH JURY DEMAND** <br> **ENDORSED HEREON** |
| -vs- | : <br> : | |
| BLUFORD JACKSON & SON, INC.<br>910 U.S. Rt. 50<br>Milford, OH  45150 | : <br> : <br> : <br> : | |
| Defendant. | : | |

## I.     THE PARTIES

1. Plaintiff William L. Cmehil ("Cmehil" or "Plaintiff") is a citizen of the United States and a resident of Highland County, Ohio.  At all relevant times, he was employed by Defendant Bluford Jackson & Son, Inc.

2. Defendant Bluford Jackson & Son, Inc. ("Bluford Jackson" or "Defendant") is domiciled in Milford, Clermont County, Ohio.

3. Defendant is an employer within the meaning of state and federal law.

## II.     JURISDICTION AND VENUE

4. This Court has jurisdiction to hear this case pursuant to 28 U.S.C. § 1331 because Plaintiff's federal claims arise under the laws of the United States.

5. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims derive from the same operative facts and are so related to his federal claims over which the Court has original jurisdiction that they form a part of the same case or controversy.

6. Venue is proper pursuant to 28 U.S.C. § 1391 because Plaintiff was employed in this Division and District, and the unlawful conduct alleged in this Complaint took place within this Division and District.

### III. THE FACTS

7. Cmehil was employed by Bluford Jackson & Son, Inc. until his recent unlawful termination.

8. Cmehil began working for Defendant in July 1999.

9. As a welder/fabricator, Cmehil welded and did other tasks to fix trucks and make repairs.

10. Cmehil was supervised by Curt Foster, Shop Foreman, and Danny Jackson.

11. Cmehil was Defendant's main welder for the last ten years.

12. Defendant received wrecked trucks that Cmehil would work on within the shop.

13. On March 8, 2019, there was a large dump truck bed and a large trailer at the shop for Cmehil to repair and fabricate.

14. Defendant had regularly provided Cmehil with old, unsafe equipment to do his welding and fabrication work.

15. For example, Cmehil was forced to use a chain hoist to raise and lower truck bodies, which would require him to go underneath the hoist in order to do work on the trucks. This hoist and chain was never serviced or inspected during the 20 years of his employment with Defendant.

16. Cmehil started working on the dump truck body on March 8, 2019.

17. There was also work he was to perform on a trailer that had a 35 foot aluminum wall.

18. Plaintiff did not finish the dump truck work that day.

19. Plaintiff was having safety concerns over the ensuing weekend about working on the truck and aluminum wall, given their size and given the condition of the equipment he was required to use in the shop.

20. On Monday, March 11, 2019, Cmehil spoke to his supervisor, Mr. Foster, about these two truck jobs.

21. Cmehil told Foster that this work was far too large and involved for Defendant to do, and that it was unsafe for Cmehil to attempt to do the work there.

22. In particular, Cmehil noted how unsafe it was to use the shop chain hoist for this work.

23. Foster asked what would be necessary to make the job better/safer.

24. Cmehil replied that there was nothing to do to make the job better/safer, and that Defendant should simply not undertake such large and involved work since it could not be done safely in that shop.

25. Foster noted that he had done similar work in the past, to which Cmehil said he had "wised up."

26. Foster responded by laughing and said that even though Cmehil did not think anyone should do the job, "somebody was going to do this job."

27. Cmehil reiterated that Defendant did not have the facility or equipment for this type of work. He noted that when he was working off a ladder on large trucks like these, there was only about 3 to 4 feet of space between him and the wall for him to do his work. Such work, in close quarters, on a ladder, is inherently dangerous.

28. Foster told Cmehil that he would have the owner, David S. Jackson, speak to him.

29. Cmehil went back to work on the dump truck, expecting to hear from Mr. Jackson.

30. There was a 22 ft. long wall to fix on the dump truck. That job involved repairs to the right side wall and replacing a wrecked rail. The wall had to be cut out and a used wall from a wrecked trailer had to be cut out, straightened and repaired, and put back in.

31. Despite waiting to meet with Jackson, no meeting with him occurred on March 11th.

32. The next day, Tuesday, March 12, 2019, Cmehil again worked on the dump truck.

33. Mr. Jackson arrived at Bay 6 where Cmehil was working shortly after 9:00 a.m.

34. Plaintiff showed Mr. Jackson how he was using a rickety, 8 foot fiberglass ladder. He climbed the ladder while Mr. Jackson watched and observed the rickety condition of the ladder.

35. The ladder was next to the trailer and Cmehil was using the welder leads.

36. Cmehil asked Mr. Jackson what would happen if he fell off the ladder and broke his neck. Mr. Jackson did not answer him, but shrugged his shoulders.

37. Plaintiff then walked back to the chain hoist that held the trailer wall. He demonstrated raising the wall that was hanging over him and said to Mr. Jackson that the chain hoist had not been serviced or inspected for decades, and Cmehil could be crushed using it. Mr. Jackson again shrugged his shoulders.

38. Cmehil went further down into the bay. The bays typically have tools and debris laying in the aisleways and exits, creating congestion.

39. Cmehil showed Mr. Jackson a skid with truck parts on it, which he put out of the way.

40. Plaintiff pointed his finger to his chest and told him that this was about his safety.

41. Defendant has had ladders in the shop that came in on scrap-hauling trailers and were tagged to be out of service, but were nonetheless used by Defendant's employees, including Cmehil, in the shop.

42. While Cmehil was speaking to Mr. Jackson, his son Danny Jackson came out. Danny Jackson said "come on Dad," and the two of them walked away from Cmehil, with Danny Jackson saying he could not talk to his father when Cmehil "was like this".

43. Cmehil reiterated that these were safety concerns as the two continued to walk away. Danny Jackson said that they were not going to talk now, and Cmehil said that this was something that needed to be talked about now.

44. Plaintiff told Jackson that the shop needed to be "100% OSHA compliant."

45. Mr. Jackson told Cmehil that Defendant gave him gloves and glasses (as if that constituted complete OSHA compliance).

46. Cmehil replied: "Where's the eyewash station?" Danny Jackson said there was one in the First-Aid cabinet.

47. Danny Jackson and Cmehil then went to the First-Aid cabinet to check on the eyewash. There was in fact no eyewash bottle in the First-Aid cabinet.

48. Cmehil said there should be one in the First-Aid cabinet and one at the sink. The sink often has parts in it that are being washed, making it unavailable as an eyewash station in any event.

49. Mr. Jackson's (and his son's) dismissive attitude toward Cmehil's safety concerns upset him. That, combined with his legitimate concerns for his welfare, caused him to clock out and leave the shop around 10:00 that morning.

50. The next day, March 13th, Cmehil punched in as usual around 6:00 a.m. He started taking pictures of the unsafe working conditions in the shop. He took pictures of truck walls, wiring, fluids, sink, oils and chemicals on the floor and in the aisleways, and old equipment; all of which were safety concerns and OSHA/EPA violations.

51. Upon information and belief, two co-workers saw Cmehil taking those pictures and informed Mr. Jackson, Danny Jackson and/or Mr. Foster.

52. Just before 9:00 that morning, Jackson and his son Danny approach Cmehil. Danny Jackson told Plaintiff that since he did not like working there, and since he was older and it was hard for him to get around, that they were letting him go.

53. Danny Jackson provided Plaintiff with a letter, signed by Mr. Jackson, stating:

> Please be advised that today, March 13, 2019 is your last day of employment. Checks will be mailed to your home address. All communications will be done thru the mail.
>
> You are not allowed on these premises as of 9:15 a.m. today.

54. Cmehil was 59 years of age when he was fired by Defendant.

55. Danny Jackson is 36 years of age.

56. Thereafter, on or about March 28, 2019, Plaintiff filed a whistleblower complaint against Defendant with the Occupational Safety and Health Administration Chicago Regional Office, alleging a violation of Section 11(c) of the Occupational Safety and Health Act.

57. Separately, OSHA inspected Defendant's facility on various dates between April 2 and April 25, 2019, and on June 5, 2019, issued a citation against Defendant for a serious violation of the Act and the regulations found at 29 C.F.R. § 1910.178(a)(4).

58. After his termination, Plaintiff filed a charge with the Equal Employment Opportunity Commission/Cincinnati Area Office, alleging that Defendant had violated the Age Discrimination in Employment Act in terminating Plaintiff's employment due to his age.

59. On June 12, 2019, the EEOC issued Plaintiff a Notice of Right to Sue.

### IV. THE CLAIMS

#### A. COUNT I
**(Violation of the Federal Age Discrimination in Employment Act)**

60. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

61. Plaintiff was over the age of 40 and qualified for his position at all relevant times.

62. During his employment with Defendant, Plaintiff was treated differently than similarly-situated younger employees.

63. Defendant told Plaintiff at the time of his termination that he was being fired "since he was older and it was hard for him to get around… ."

64. Defendant terminated Plaintiff's employment because of his age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et. seq*.

65. Plaintiff was replaced by individuals who were substantially younger in age than Plaintiff.

66. Defendant's actions were intentional, willful, wanton and malicious in nature.

67. As a direct and proximate cause of Defendant's unlawful discriminatory conduct, Plaintiff has been damaged and is entitled to judgment against Defendant under the ADEA for all damages resulting from its unlawful discrimination.

#### B. COUNT II
**(Age Discrimination in Violation of Ohio Law)**

68. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

69. Plaintiff was over the age of 40 and qualified for his position at all relevant times.

70. During his employment with Defendant, Plaintiff was treated differently than similarly-situated younger employees.

71. Defendant told Plaintiff at the time of his termination that he was being fired "since he was older and it was hard for him to get around… ."

72. Defendant terminated Plaintiff's employment because of his age, in violation of Ohio law as embodied in R.C. § 4112.14 and 4112.99.

73. Plaintiff was replaced by individuals who were substantially younger in age than Plaintiff.

74. Defendant's actions were intentional, willful, wanton and malicious in nature.

75. As a direct and proximate cause of Defendant's unlawful discriminatory conduct, Plaintiff has been damaged and is entitled to judgment against Defendant under Ohio Revised Code § 4112.14 and § 4112.99 for all damages resulting from its unlawful discrimination.

## C.  COUNT III
### (Wrongful Termination in Violation of Ohio Public Policy)

76. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

77. Ohio recognizes a public policy exception to the "employment-at-will" doctrine.

78. A clear public policy exists and is manifested in the federal Occupational Safety and Health Act, encouraging safety in the workplace and forbidding retaliation against those who file OSHA complaints and/or express safety concerns aimed at correcting unsafe and unhealthy working conditions.

79. Dismissing employees under circumstances like those involved in Plaintiff's dismissal here would jeopardize the public policy articulated above.

80. Plaintiff's dismissal here was motivated by his conduct related to the public policy articulated above, that is, his complaints about unsafe and unhealthy working conditions.

81. Defendant lacked an overriding legitimate business justification for the termination of Plaintiff's employment.

82. Defendant wrongfully terminated Plaintiff's employment, in violation of Ohio public policy.

## V. RELIEF REQUESTED

**WHEREFORE**, Plaintiff William L. Cmehil, demands judgment against Defendant as follows:

(a) That Plaintiff be reinstated to his employment effective March 13, 2019;
(b) That Plaintiff be awarded all lost pay and benefits;
(c) That Plaintiff be awarded compensatory damages;
(d) That Plaintiff be awarded liquidated damages;
(e) That Plaintiff be awarded punitive damages;
(f) That Plaintiff be awarded pre-judgment interest;
(g) That Plaintiff be awarded reasonable attorneys' fees and costs; and
(h) That Plaintiff be awarded all other legal and equitable relief to which he may be entitled.

Respectfully submitted,

/s/ **Brian P. Gillan**
Brian P. Gillan (0030013)
Randolph H. Freking (0009158)
FREKING MYERS & REUL LLC
600 Vine Street, 9th Floor
Cincinnati, OH 45202
PH: 513/721-1975 – FX: 513/651-2570
bgillan@fmr.law
randy@fmr.law

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all matters so triable.

/s/ *Brian P. Gillan*